Okay, the next argued case is number 16-2309, Advanced Video Technologies against HTC Corporation. Mr. Morris. Thank you Judge Newman, may it please the court, I'm Robert Morris on behalf of ABT. District Court's dismissal of the complaint below failed to recognize that Vivian's son was never a co-owner of the 788 patent. She never had any rights in her own name. Her rights, if any, were governed by the employment agreement that she signed when she was with InfoJet. Well, I mean, the court specifically found that the employment agreement was an agreement to assign in the future and not an actual assignment at the time. So when you say the court failed to recognize it, the court recognized that that was your argument, but disagreed with you on that reading of the contract. Vivian's son had entitled, in her name only, the rights. The employment agreement itself, as the District Court acknowledged, Vivian's son held all of the rights, any right, title, and interest to the patent on behalf of the company. So the company was the beneficiary. Right, but the company never sued to enforce her employment agreement. In other words, to require her to make the assignment that she promised to make. Right? I acknowledge that. That's correct. They never sued her to enforce that. But the district judge actually put significant weight on the fact that, and I gather that the inventor was not joined as an involuntary party, plaintiff or defendant. In this case, either way, I can imagine without knowing that the trial judge wondered, maybe there were intervening events that were brought out. But what struck me was that the district judge, in the court's opinion, remarked that there had been no action taken to compel assignment. I understand that point, Your Honor. Under California law, because Vivian's son held any and all title, rights, and interest on behalf of her company, on behalf of the company. That was the language that's acknowledged by the District Court in the opinion. Under California law, Vivian's son could never be named as a plaintiff. Under California law, as a trustee holding it on behalf of the company, if she filed suit for patent infringement, it would have to be in the name of the company. And we have those same rights. But what was the purpose of the trust? Was the purpose of the trust to assure that she would execute the assignment that was required? The purpose of the trust was to ensure that the company would always retain all the rights to any intellectual property that was developed by any employees during the time that they were employed. I mean, the employment agreement, if you read the agreement the way the District Court construed it, then the employment agreement basically says, all of our employees, we're going to pay for you to develop technology, and if we don't sue you and you refuse to sign the agreement, you can sue us for patent infringement. No, the employment agreement can expressly state the assignment. Here we have an employment agreement that provides for an assignment in the future. You know, you promised sometime in the future to assign, but you can't have an employment agreement where the assignment is immediate. Well, you can, but that wasn't the case here. Well, that's the problem. But the case here, as the District Court acknowledged, the District Court went out of its way. On Appendix 17, the District Court's opinion. The District Court says, if by signing the employment agreement, Sun was assigning away her rights to the invention, she would not need to hold them in trust for anyone. She would have already given them away, but the contract language plainly contemplates Sun would keep title to the inventions, albeit for the benefit of her employer, until such time as she executed the assignment. But Counsel, what about if she just said she'd keep title to it, even if it's for the benefit of the employer? She keeps title. The title still resides in her name. The title definitely resides in her name, but under California law, because it's for the benefit of the employer, she cannot sue under her own name. Well, that's a different question. I mean, and she couldn't have sued the company anyway, because the company would have had a shopper right in her inventions if it was done during the course and scope of her employment. But there's a different question of whether or not she needs to be a party to a suit that chooses to sue a third party. She has no rights. All of the rights, in the employment agreement, further on in the employment agreement, 2E, she gave a present quit claim of any right to sue anybody. I hereby, hereby was magic language according to Judge McMahon, I hereby waive and quit claim to the company any and all claims of any nature whatsoever, which I now, and this is a appendix 260, or may hereafter have infringement of any powers. She doesn't have the right to sue. But what troubled the district judge seems to have been that no action was taken to perfect that, to enforce, to enforce the employment agreement. That instead, this court and an infringement suit was being asked to enforce an employment agreement involving an employee, a person, an inventor, who is not before the court. What I take from the opinion that was written was that this was a troubling factor that no action had been taken to enforce the assignment. That this trial judge was being asked to assume it was assigned. The trial court was, we never asked the trial court to assume that it was assigned. All of those arguments were put forth by defendants. Defendants built this house of cards that said that plaintiffs were trying to say that the trust was somehow on an assignment, and we've never asserted that. All right, well, she actually did say your primary argument is the trust argument, which is, and so she went on to address that, correct? No, she never addressed the trust argument. What do you mean she never addressed the trust argument? She does, she specifically does. And she talks about the trust and the implications of the trust. And part of the problem is that a trust creates, yes, equitable title in the company, but legal title remains with the trustee, correct? Yes. And you have to have those with legal title as parties to an infringement proceeding. But according to California law, she can't be a party. According to California law, if you are a trustee, you have to sue on behalf, you have to sue in the name of the beneficiary. She can't sue in her own name based on California law. This is a California agreement. Info Chips was the beneficiary originally. ABC became the beneficiary later. She could never, she can't be named as a plaintiff in a lawsuit. That would be wrong under the law, under California law, because she was a trustee. So you're saying that the purpose of the trust was to allow her to sue in your name, in the company's name? No. If you look at the agreement the way that Judge McMahon wants to look at it, the quit claim can never come into being. Because according to Judge McMahon, the only way the quit claim comes into being is after she already has signed gifts on it. In which case, there are no rights to quit claim. If you look at the agreement the way it is... Well, it does say, assigned here under. I mean, it's not like the judge didn't have a basis for what she was saying. But that renders that provision, and that it's black letter contract law. You can't do that. That provision could absolutely never come into play according to that construction. If she made the assignment, it would. No, then there's nothing to quit claim. If she made the assignment, she gave away all the rights. Well, you can't have a contract that has belt and suspenders in it? You can have a contract to do anything you want. This is not one of those contracts. This is an employment agreement in the world of technology, in Silicon Valley. The company itself is trying to protect all of its intellectual property. So it has its employees come in. They sign an assignment. Right, well, we've seen a ton of these employment agreements. And a lot of them are written a lot more clearly than this. So, I mean, for you to say that this, we should just assume because it comes out of Silicon Valley, that it was done in a way that effectuated what you want it to do, shouldn't be the end of the inquiry. I guess I'm not trying to say that, Your Honor. If that's what you implied, I apologize with all due respect. I'm not trying to say that. But if you look at the agreement... Well, Counselor, we do see a lot of agreements dealing with assignment of interest to patents. And the problem with this agreement, at least in regards to your argument, is that this is a promise to a site. She promised to a site, and as she breaches that promise, in other words, she says, I'll do this in the future. But no one ever got around to doing it. And the way to perfect that is to have sued her for a breach of that promise. Now you have a judgment. Now you're all set to go. Well, we understand that. But with regard to provincial standing, it's really a question of, is there any threat of suit by anybody else? Do the defendants have to worry about getting sued by anybody else? And the answer is no. If someone can't sue them, no one else can sue them. If you take that one-third interest by itself, there is no doubt that no one else can file suit against them. We have 100% of the rights that exist today to file suit under the 788 patent. The employment agreement starts off with, you sign the employment agreement. You could claim the right to ever sue for patent infringement if you have a conception of anything you ever develop while you work here. Then you start to work there. You can't hold anything in trust that you haven't invented. Then you come up with a conception. You haven't gotten within in-house or outside counsel. You haven't prepared a patent application. You haven't done anything yet. So now you're holding it in trust on behalf of the company. Patent application gets filed. It's still in trust. Somebody puts the documents in front of you to sign. Vivian soon refused to sign. You're still holding it in trust on behalf of the company. You would need her consent. She would have to sign on to any lawsuit, even if this went into a trust. All that means is the trust is holding this on her behalf. No, no, her behalf. The plain language of the employment agreement says on behalf of the company, and that is acknowledged by Judge McMahon on page 817. Okay, but it's still, if the company wished to sue, then she'd have to sign off on that. The company doesn't exist. She's not, she has no power on behalf of the company to do anything at that point in time, and she doesn't, just because the company is eventually dissolved, she then doesn't get the rights in her own name to go file lawsuits or to control what happens to the intellectual property, to the assets of the company. Mr. McMahon, I agree with what you're saying, but I'm still taken with this district court said, or I just perfect your title. She didn't sign it. She refused to sign it. Sue her. Join her, something or other, rather than leave it unassigned with all of the ancient rules that inventors own their inventions unless they assign them. So she's agreed to assign it, but she hasn't fulfilled that promise, and this is, this leaves a gap that this district judge looks to be, as if correctly, thought needed to be filled rather than asking this court to, that court, the district court or this court to, we'll never mind, we'll assign it on your behalf. We're not seeking any assignment. We didn't seek any assignment from the district court. That was the problem. We didn't seek any assignment here. We have 100% of the existing rights to sue under the agreement. She quit-claimed all of her rights. Once she did that, she could never sue. The right to sue was gone. She disavowed it. I'm not saying she assigned it to anybody, but she disavowed it. She didn't have it anymore. On what grounds did she refuse to assign when she had an appointment agreement that said she would? On what grounds did she refuse to assign when she had an appointment agreement that said she would? We have no idea, Your Honor. We don't know the facts. Nobody ever took her deposition. My understanding is various people tried to contact her on both sides. Did you try to involuntarily join her? I wasn't a part of the case at the point in time when any of anything like that happened. No, I mean when you filed this case. Did you try to join her under Rule 19? No, we did not try to join her under Rule 19. Okay, let's hear from the other side. We'll save the rebuttal time. Ms. Keefe. Good morning, Your Honors. Heidi Keefe on behalf of the appellee. I think Your Honors have hit the nail squarely on the head with what the issue is, which is whether or not legal title ever was assigned from Ms. Hsun to anyone. And she simply did not. I don't know why she couldn't have been joined in this suit as an involuntary plaintiff or defendant.  It never happened, Your Honor. Our STC decision, from which Judge Newman and I both dissented, said that you can't do that, right? Right. So we were missing two judges, including Judge Rayner, who was recused. So who knows where that might end up if someone tried it again. Well, maybe, but the facts are also somewhat different. It is, but still looking at what this district judge held, it's inconceivable to me that there's no remedy. But as to what that remedy might be is the question. Well, it seems to me, Your Honor, that the remedy would have been for the appellant here to have attempted, back when the breach first occurred, to enforce the agreement. And, in fact, this court has noted in numerous other cases that that is the proper thing to do, is to actually bring suit in order to enforce the agreement. One of the cases— Why wouldn't the quitclaim provision just render all of that future activities superfluous? So the first point, Your Honor, is we have to look very carefully at the language of the quitclaim itself. And the language of the quitclaim says that it only comes into being on any application assigned here under. So the language is on Appendix 260. I hereby waive and quitclaim to the company any and all claims of any nature whatsoever, which I now or may hereafter have infringement of any patents, copyrights, or mask works resulting from any such application assigned here under to the company. Nothing was— Just looking at that, any such application assigned here under, and I focused on the words assigned here under early, but then I got to thinking, well, is it talking about the company who gets the assigned title assigned here under, or does it have to be, in other words, from his son? I believe it does have to be from his son. In fact, if you read the entire section— But that's not entirely clear. To me, the reasoning, the thing that makes it work together, and the only thing that allows all of the provisions to kind of come together, is that Ms. Yun is under Section 2B, holding legal title in trust for the company, and says she will assign. Not I have assigned, not a present assignment here under, but I will assign to the company all of my right and interests. But it didn't exist, so you can't assign something that didn't exist? That's part of it. You can't assign—you can, though, assign a future interest. And, in fact, there's numerous cases that talk specifically about— That's what I mean. So now if we have a patent that's assigned to the company— Says we'll assign. Which she did not do. Which she never assigned, so there is no assignment. I will assign, but she didn't do it. Had she assigned, had she assigned the patent, then the quick claim would kick in. And I think the reasoning for that, if we look to, for example, the Crown Die case, which talks about you can't just have a naked right to sue. You have to make sure that you have all of the rights together. If Ms. Yun, for example, if the patent had issued, and Ms. Yun had assigned, say, three years later, there would be three years of infringement sitting there, for which the company would not have rights under the assignment because the assignment just goes from that day forward. Therefore, the quick claim would kick in to make sure that the company now, by virtue of the assignment, coupled with the quick claim, has rights over the entire period. So I think the only reason the quick claim even existed here was in essence to fill the gap that Crown Die would otherwise have said exists based on a later assignment. And so I think that that's how they work together, and it reinforces the notion that this is all about a future assignment, the will-assigned language. Well, the part that bothers me the most and the part that I struggle with the most here is the trust. If it is in trust, and it's still held in trust, theoretically, to this day, why isn't that, and the trust did say that it was for the benefit of not just the company but its successors or assigns, why isn't the trust enough? Well, under California law, when a trust is created, the rights are split into legal rights and equitable rights. The legal rights maintain themselves with the trustee. The equitable rights are maintained with the beneficiary. Here, it's not enough to simply say, well, the beneficiary has equitable rights.  That's black-letter law, and the legal rights have not been passed over. So even if, for instance, our STC case said that you couldn't involuntarily join a co-owner, you might be able to involuntarily join a trustee. Potentially, though, I would still say no because the trustee, it's the same idea that there's legal title there. And so if that case were to kick in, you can't involuntarily join someone who does have their legal rights in the patent. But they're not seeking to enjoin her. If they have equitable rights in the patent, just like a licensee, why couldn't they enforce the patent? Because, again, we don't have all co-owners present. And so if we look to the, sorry, there's cases that specifically talk about the notion that you have to have all co-owners present. The bioengineering and a series of other cases that are all cited in our briefs talk about the fact that you have to have all co-owners. Ms. Yun currently is a co-owner because she retains the legal rights in the patent because they've never been assigned. It's inconceivable that a person who goes through all of these standard formalities can then just dig in and say, I'm not going to sign. So what, in your view, would be the next step for someone who finds that there's this recalcitrant employee? To me, Your Honor, the next step would have been a lawsuit for breach of the employment agreement in order to enforce the assignment. And that's exactly what happened. That's what the district judge said as well. And it's exactly what happened in, for example, the Regents of University of Mexico versus Knight case. In that case, the regents had a series of patent applications that had been assigned, and then a series of continuation and part applications were filed, and the inventors refused to assign. And so the regents brought suit to enforce the assignment. And the board there, the court, did hold that, in fact, the employment agreement did say that they had an obligation to assign and found that they had been in breach of their agreement and forced them to assign their rights. That's what should have happened here. They knew about this breach way back when they first asked Ms. Chun to sign, and she refused to sign. So in the record, what we have is that not only did they understand that she had not signed, even though they believed that she was supposed to, they actually sent an office manager, this is at A276, Mr. Cortez, the office manager, was sent to obtain her signature. She did not sign. Right then, at that point, and this is back in 1995, I believe, maybe 1995, as soon as she didn't sign in 1995, there was a breach of the employment agreement, and under California law, they had four years to sue for breach of the employment agreement in order to perfect the title and make sure that it all worked going forward. They may have been able to say that perhaps it wasn't until they actually recorded the assignment, which happened just a little bit later in 1996 with the blank that didn't have her name on it, and that happened in the record at filing the assignment at A283. You can see that there's no signature from her. Again, they could have sued for breach of the employment agreement. They had four years under California law to do so. They didn't do it. So here's a new owner. You're saying that that statute of limitations ran and it's over and there's no way of obliging her to sign? Under these facts, I do believe that that is the case. It was the obligation of the original owner to perfect the title. They had a contract with her. The contract was breached. If, in fact, there was a breach, that's the other only thing that I'd like to point out is here, we know they didn't sue. In fact, it's unopposed that they didn't sue. We don't know why. There may be another agreement out there somewhere that hasn't been produced that says that there's no ability for them to sue because there's no breach of the contract. We simply don't know. But under the facts of the case as they exist, legal title was never passed from Ms. Shinn,  and therefore the court correctly dismissed the case. And one of the problems that we have is simply that we don't know why she wasn't sued, but the fact is she wasn't. She was never brought into this case, and therefore she as a co-owner is necessary to the case, and she's sitting out there not a party to the case. Do you think that the trust still exists today, or do you think it expired with the expiration of the employment agreement or the statute of limitations related to the employment agreement? I honestly don't know. But she's not a co-owner. If the trust exists, and unless there's some other limitations period we don't know about, then she wouldn't have the opportunity to dispose of this right. I'm not sure I agree with that, Your Honor. I actually do think that the trust probably still exists. I just don't have a legal site for you that even though the employment agreement is out there and not being enforced because InfoChips doesn't exist, I think it probably does still exist, in which case she is still the legal owner under the trust. If, for instance, we did have an occasion where the trust was dissolved, the rights would go back to Ms. Shoon, because as the inventor, rights vest with the inventor. So I don't think there's any opportunity that even if the trust were to have been dissolved, that doesn't mean that it goes back to InfoChips or anyone else. It goes back to Ms. Shoon as the inventor with whom there was never an assignment, and so the rights would still vest with her that way. An inventor with an explicit obligation to assign. Which she did not do. Which she did not do, but the obligation nevertheless existed. The obligation did exist, but she did not do it. There was no assignment made. There was no written assignment made of the matter. I wonder what that means. I'm not so sure that it's so clear-cut. I think we have to look, though, at the fact that because the rights vest with the inventor, in the first instance it's very clear that we have to have a written assignment, and the written assignment can be made presently. They chose not to use present language in the contract that they had with her for whatever reason. They said, will assign. And then the fact that they did not enforce that agreement with her means that the rights have remained with her. Maybe. And we simply don't know. Maybe that hasn't been decided. We have no idea what rights remain with her. These patents have expired. Isn't that right? That's correct, Your Honor. That's correct. But I still think that based on the record, as we know it, she may have had an obligation to assign. Sorry, there was a contract that had language in it that says that there was an obligation to assign. We know that there was no enforcement of that agreement. We don't know whether or not there was a subsequent agreement between Ms. Shun and Mr. Wu or anyone else that, for example, changed those rights. And that's one of the reasons that we have to have a written assignment. It can't just be, oh, and somewhere somebody did a handshake and it all worked out. Well, that's by statute. By statute. And I think the reasoning for that is so that everyone knows who needs to be a party to these suits, so that it only happens one time. And here, under the clear record, there has been no assignment made from Ms. Shun, either as an individual or as the trustee, holding the legal right to the patent. And, therefore, she remains a co-owner. Maybe it was equitably transferred. I don't think that there's any— On its face, she violated the agreement. On its face. But I don't believe—well, the only reason I hesitate— Without any excuse. I agree. Who knows what else came into play? But on its face, all that there is in the record, and no one has put in anything else, is that she promised that I will do this. And when the time came, she said, go away. I agree with you, Your Honor. And yet they then—anyone then at that point, whether it be InfoChips, Woo, ABC, at that point, had the ability to sue for enforcement of the contract, to make her do the assignment, and they did not. And it does beg the question, why not? Maybe there's something else that they know that we don't about whether or not the rights had changed. All we know is that legal title never passed from Ms. Shun, either as an individual or as a trustee, to anyone else. And therefore, she is a proper co-owner, and the suit can't progress without her. And that's why the district court dismissed with prejudice. They had also— You can't act on an equitable title? I think you can, under the appropriate circumstances. Under the appropriate circumstances where perhaps you are seeking only equitable relief, I think Your Honor might be right. No, if there's not an equitable title, why would that affect the relief? Because in order to—so what Crown Dye made very clear— Anyway, if you're looking for an injunction, that's equitable relief, so maybe that's not an obstacle. I think had there only been seeking of an injunction, that hypothetically might have been something that we could have argued or briefed. And I would argue that in that case, maybe if they disclaimed all— to any legal remedy, i.e., any money whatsoever, we might be having a different discussion. But that's not what's being sought here, and that's exactly what was happening in the Dye case. Because in the Dye case, there was a naked right to sue given, and they said that if you're going to look for damages going into the past, you have to have legal title. Not just the equitable title that was transferred, but full legal title. And that's what they said in Nebraxus, too, right? That's correct, Your Honor, and that was the same in Nebraxus. And they specifically distinguished between legal and equitable, and said in order to gain damages and sue, you have to have legal title. Okay, any more questions? I have a question. Yes, please. On the pet claim provision, on the language where it ends, or mask works resulting from, and then it says any such application assigned here under, let's say instead of that, it said resulting from my employment. Would that be an effective quit claim in your view? If they had replaced the language from any such application assigned here under to from anything that happens to my employment. From my employment with the company. I think that might have. I haven't had time to think it all the way through, but I think it might have. And it's because the language here is very specific. My experience with quit claim deeds is that they're very difficult to get out of. And this language here, this last language to me is just not entirely clear. I mean, you can, I can work for a company, and I can give up all rights on patents that the company acquires under an assignment with another company. And the company says just to make sure that there's no problems here, let's get a quit claim deed from Judge Reyna. And I think if they did the quit claim deed in language that said, and I hereby quit claim any rights I had under anything that had my name on it, you might be right, but they didn't clearly say. Well, when I look at now, now let's go back, now that we got that straightened out, let's go back and look at the language any such application assigned here under to the company. Is that really only referring to the assignments made, you know, under the employment agreement? I believe that it is, because it's within the exact same section called retaining and assigning inventions and original works, of which the second paragraph specifically describes what she needs to do to assign those works. And so I absolutely believe that they're linked together. And it's not a broader category. It follows, the paragraph follows, not immediately thereafter, I think it's three paragraphs later, but specifically talking about assignments to that technology. And I think that refers directly back up to those that will be assigned. If nothing gets assigned, the quit claim doesn't kick in. They could have written it differently. They didn't. And by virtue of saying that the quit claim will apply to applications assigned here under to the company, it's acknowledging that if there is no assignment, there's no quit claim. Who wrote the agreement? Who wrote the agreement? Do we know? I don't know. Was it the company's counsel? The answer is I don't know. But if you look at the last page of the agreement, it's actually countersigned by Mr. Wu, who actually is one of the other inventors, who then took all of the other, you know, tried to buy all of the rights of InfoChips as it was going under. And so here I would think that an ambiguity would have to be construed against Mr. Wu so that he knew, because he knew what was happening. And then just one other thing that I'd add to your honor is that the contemporaneous facts of what else was happening at the time, which we actually know from the New Mexico Regents versus Knight case, are a very good place to look in order to figure out what's going on with the contract. When Mr. Wu attempted to bring Ms. Chun into the prosecution, he couldn't get her to sign and he had to bring her into the prosecution. There are two boxes that you can actually check on the form of whether or not you're bringing somebody in who has assigned their rights or someone who has agreed to assign in the future. And he checked the box for agreeing to assign. That's an argument we make in our papers. And so that's contemporaneous evidence that Mr. Sun himself realized that no assignment had been made, that their rights didn't already vest within his company. He was trying to get her to sign, and when she didn't sign... Well, because the invention hadn't been made when she became an employee, so this was the agreement to assign my inventions, which by definition were a future act. I agree with that, Your Honor, but what I'm talking about is at the point where the applications are being filed... So Mr. Wu gave the plain reading to the employment agreement. He said, I agree to assign. And she says, well, all right, but I'm not going to sign anything. Correct, and that pulls us right back to the fact that he knew that she still had to assign, that it was a future assignment, and that the future assignment hadn't been perfected. He also then, when he checked the box, he didn't say, and I already have all the rights, because if you believe Appellant's argument, he didn't have to, because he already had all the rights. It was already all there with the employment agreement. He would have checked the box D that says, I already have everything that I need to have, and so you can just go forward without. Instead, he attached the box that says, I know that we still need to finish that off. I'm just using that as further example of the fact that the reading of the quit claim as being something in the future is supported by the contemporaneous actions of parties. Well, the patent didn't exist, so that in terms of an existing property right, all of this is, in a sense, perspective. But at the time, the things I'm talking about being contemporaneous, the patent did exist at that point. The application existed. I apologize, you're correct. The application existed. And what he checked is saying that the application will be found. And who received the application? I'm sorry? Who received the rights to the application? So the rights to the application vest in the inventors unless they have assigned their rights. And so when the assignment was recorded and the assignment... So in the quit claim provision where it says, application assigned here under, under the contemporary facts, to whom was the application assigned here under? She did not assign to anyone. So she retained the rights herself, and the quit claim didn't kick in. No, was it assigned to the other inventors? So the other inventors, Wu and Li... Were the company? Were her company? So Wu and Li did assign the application to the company, and that's recorded at A-283. And so the application... And they did an assignment after the fact. Correct. Correct. They actually effected a real assignment. So at that point... If the agreement was such that they had all assigned as of the point in time when they were hired, they wouldn't have had to execute those later assignments. That's exactly correct. And the fact that they were trying to get Ms. Jin to sign, and that they acknowledged that they needed to get her to sign, and therefore had to go without her, is contemporaneous evidence that supports the reading that the quit claim does not kick in at all until there's an assignment and no assignment was made. So I agree with your... An assignment from her. An assignment from her. That's what you're saying, but that doesn't say this. But I think that's what it does say, Your Honor. Well, you want us to read into some words here, and I acknowledge we're within the overall structure of the employment agreement, the quit claim provision. But the quit claim is a pretty strong language, and it does say, I hereby waive a quit claim to the company, any and all claims, and it goes on. The last, it ends up by saying, assigned here under, and everyone's argued that this means sometime in the future, it relates to a potential assignment, but as soon as the application was made, and the patent was granted, or the application was granted, the quit claim could have kicked in at that point. I disagree. Nothing else has to happen. No, I disagree. It cannot kick in until an assignment's been made, and I think in fact, Your Honor... But you want it to be the assignment from her. I want it because the quit claim is about her. It's about what happens to her rights as an employee. It's all about her. But the assignment of the application doesn't have to be just about her. Well, it does. Every inventor has their own united rights in the application, and in order for the company to... But at the time she signed this, there was no application. Because it talked about what she was going to, if she had signed it, and I think she... And she said, I hereby quit claim of anything, any patent that is assigned, and I'm saying, why can't that be... It does say to the company, assignable, but it doesn't say from whom. Well, I think... So it seems to me this quit claim provision can be read to mean any patents or any type of interest that this company acquires. I hereby quit claim. No, I disagree, Your Honor, and again, it's because you have to look at the very specific language. As you yourself pointed out, quit claims are very tough things. They're broad and they're hard to get out of, and so I think what this language is saying... They're binding. They're binding the minute you make it. When you make it, and what this is saying is, we're not going to make it. We're not going to have the quit claim come into being until there's an assignment of rights. I don't... Then it should have said, as of and such time that, but it doesn't say that. She gave up her rights immediately, without exception, and it goes back to the interpretation, I think, of the words, such application assigned here under to the company, but we don't know. It seems to me it could refer to all, including mine, everything. I give up. I won't sue you, company, if you get a patent in the future that even I have nothing to do with. I'm not a named inventor. I still won't claim any type of interest in that. As long as it's an application that's been assigned to the company. That's the problem. You have to give the language meaning. I hereby waive any rights that I have in any application assigned to the company, and so... Assigned here under, meaning assigned under that particular... That's exactly correct, and so it has to do with what she's assigning because it's assigned here under. It's not anything that's ever assigned, no matter what, no matter how. If that were the case, they wouldn't have said assigned here under. They would have just said to any rights that the company may have, and so I think you have to give meaning and weight to assigned here under, and therefore the quit claim doesn't even kick in until an assignment's been made, and we know that she never made such an assignment. Okay. Good. Thank you very much, guys. Okay. Mr. Morris. I'll try to be as quick as possible. My adversary just said you have to give the language meaning. To give the language meaning, according to the way she views the quit claim, it can never have any meaning. It just can't. Well, she just explained how it could have meaning. It could have meaning for a period of time if, in fact, the patent issued and the assignment didn't occur until later because our case law says that it's at the point of the assignment that the rights of the employer kick in, and so therefore she could be quit claiming anything that occurred prior to the actual date of the actual assignment. Right? Okay. Is your hypothetical that she signs the assignment after the patent issues and this is some intervening period? Yeah. I mean, you would have loved it if she had signed it at any point in time, right? Well, the... I mean, that's what our case law specifically says. Sure, but the decision... The decision is a tale of two ways to construe words. When you're looking at... What could assigned here under possibly mean other than under the terms of that particular employment agreement? The terms assigned here under are used multiple times in the employment agreement. Right, but it all relates to that agreement, right? So the quit claim doesn't get you anything more than your argument that the assignment was effective as of the date of employment. Yeah, I mean, I hereby waive is... Earlier in the court's decision, hereby is magic language. And the district court chastises AVT essentially with regard to will assign... Right, so she's waiving it as of that point in time, but only as to something that's ultimately assigned under the employment agreement. I respectfully disagree. It's a present quit claim. The quit claim's a quit claim. You can't get it back. It's not saying, I hereby quit claim, but we're not going to hereby anything until some future date and some future time. I hereby quit claim any intellectual property that gets developed as part of my employment with the company. But that's not what it says. There's lots of things that could have changed the position you're in. One is a better written contract. Another is a lawsuit to enforce any of these agreements. A third possibly would have been an effort to try to involuntarily join on a theory that she's a trustee. But you didn't do any of that. Well, we couldn't involuntarily join her in her name. I mean... Why not? Why not? California law says we can't. California law says that a trustee cannot file any lawsuit... You could join her as an inventor, not as a trustee. Excuse me? I'm sorry, Your Honor. I didn't hear what you said. I said to join her not as a trustee, to join her as the inventor, not as the beneficiary or the trustee. The person with legal title. A person with arguable... some arguable claim to quiet the title. This seems to be what the district judge had in mind when she mentioned the things that she said weren't done. I mean, the district judge had anything in the district judge's mind to get rid of the case because... No, you keep saying all that. I mean, yes, I know that that earlier opinion was inappropriate. There was language in there that was totally unnecessary. But having said that, this opinion, you can't say she just gave it at the back of her hand. She very carefully walked through every single one of your arguments. And in some instances when it's convenient for her, and when she's talking about the trust and she's talking about will assign, she sarcastically says, oh, you can't do both of those at the same time, and therefore I find that will assign has to be future so that she can hold everything in trust. The quit claim is the same kind of thing. It's the same kind of language. You can't quit claim something you don't have. With regard to the trust, the trust is the trust, and the court acknowledges the trust. In the world of patent law, if you have an exclusive license, if you get an exclusive license, the patentee doesn't have to be joined. So if you think the trust still exists, you could sue her for breach of her fiduciary obligations as trustee, right? The rights to the quit claim and the rights under the trust are the right... The rights to the quit claim got rid of the ability to sue. We went to the receiver. We went to Delaware court. All the receiver said is I give you everything that they might have had. It didn't make a determination as to what that was. I mean, I could give you everything that Judge Rayner has in terms of his interest in this patent, and that gives you nothing, right? That would give me nothing. Judge Rayner doesn't have any interest in this. But what the receiver did was the receiver went and did an independent investigation to see if anybody had any claims against the company. I mean, there was some discussion. One of my adversary was up here talking about basically because the company was dissolved, what would happen, whether the rights would revert to the inventor. I mean, that's simply not the law. She can't be the ultimate beneficiary just because the company is dissolved. And when we deal with credential standing, we're dealing with substantial rights, all the substantial rights. ABT has all the substantial rights. No matter how you look at it, no one else can file suit. The defendants are not at risk of getting sued by anyone else. We have all of the substantial rights. And that's what the case law consistently talks about. If you're dealing with the Arachnid cases, they're basically simple cases that says you didn't get all the inventors to sign. There aren't provisions of trust. There's not provisions of quid claim. In this instance, Vivian Shun has no rights. Under California law, she can't be named as a plaintiff. And so if we joined AVC, who we got the rights from through everything else, it's the same situation. It's the same set of defendants. I mean, it's the same parties who are serving the patent. The defendants have no risk of getting sued by anyone else. And that's the whole basis of credential standing. It's not statutory. It's the risk of being sued by multiple parties because you don't... The system doesn't work if a defendant goes through all the expense of a lawsuit against someone and then they get sued all over again by somebody else. Vivian Shun can't sue them. She can't sue them on her own behalf. She can't sue them on behalf of AVC. AVC is a dissolved corporation. Info Chips is a dissolved corporation. Well, we may have discussed those concepts about the danger of a defendant facing multiple lawsuits. Our case law is very, very clear that that's simply one purpose behind our hard and fast rule that you have to have legal title. Right, and what my adversary wants you to do is they want you to look at this as it's a black and white test. If you don't have all the co-inventors, you're out. And this court has consistently said sometimes that's the rule and sometimes it's not. No, the only time it's not the rule is when all rights have been transferred to a licensee. And in those circumstances it has to be all substantial rights. And here the court found that the transfer hadn't actually yet occurred. And there are lots of cases that say if you have all of the rights to sue for patent infringement, you have all the rights. She quit-claimed her rights to InfoChips when she signed the employment agreement. When she signed her employment agreement, that employment agreement went through the LMS bankruptcy to AVC. We got all the rights from AVC that they had. And so when the receiver assigned the rights to the other two inventors and they assigned the rights to the inventors that AVC had, they had the rights that were quit-claimed to AVC through InfoChips. Therefore we had all the substantial rights. We had all the rights to sue. And that's all we need. Okay. Thank you very much. Alright. Thank you both. We'll take this under advisement. That concludes the arguments for this session. Alright.